UNITED STATES DISTRICT COURT

IN THE WESTERN DISTRICT OF MICHIGAN

GRAT DALTON,

    Plaintiff,

v.

MICHIGAN EDUCATION ASSOCIATION;
EARL WIMAN, in his individual and official capacity;
KIA HAGENS, in her individual and official capacity;
BRYANT WARREN, in his individual and official capacity;
ELENA HELMER, in her individual and official capacity;
TRACY STABLEIN, in her individual and official capacity,

    Defendants.

Case No. 1:24-cv-01188
Hon.

---

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
Attorney for Plaintiff
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
Eric@DelaporteLynch.com
Gina@DelaporteLynch.com

---

**COMPLAINT AND JURY DEMAND**

## INTRODUCTION

NOW COMES Grat Dalton, by and through his attorneys, Delaporte Lynch, PLLC, and hereby files his Complaint against Defendants for violations of the Elliott-Larsen Civil Rights Act (ELCRA), Title VII of the Civil Rights Act of 1964, and intentional infliction of emotional distress, arising from Defendants' discriminatory practices and decisions in the hiring process for the position of Diversity, Equity, and Inclusion Director at the Michigan Education Association, and what followed.

## JURISDICTION AND VENUE

1. The Michigan Education Association (hereinafter, the "MEA") is a labor union representing public school employees, headquartered in Ingham County, Michigan, located within the territorial jurisdiction of this Honorable Court.

2. At all relevant times, Earl Wiman (hereinafter, "Defendant Wiman,") was the Interim Executive Director of the MEA and an individual.

3. At all relevant times, Kia Hagens (hereinafter, "Defendant Hagens,") was the Director of the MEA Center for Leadership & Learning and an individual.

4. At all relevant times, Bryant Warren (hereinafter, "Defendant Warren,") was an MEA UniServ Director and an individual.

5. At all relevant times, Elena Helmer (hereinafter, "Defendant Helmer,") was the Public Affairs Assistant and an individual.

6. Plaintiff received a "Right to Sue" notice from U.S. Equal Employment Opportunity Commission on August 15, 2024, authorizing him to pursue his Complaint against the MEA.  **Exhibit 1** – *Right to Sue Notice*.

7. Jurisdiction based on federal question is proper pursuant to 28 U.S.C. §§1331 and 1343.

2

8. This Honorable Court maintains supplemental jurisdiction over Plaintiff's state law claims arising under statutory and common law pursuant to 28 U.S.C. §1367.

9. Venue is proper pursuant to 28 U.S.C. §1391 based on Defendants' corporate residency.

10. All of the acts complained herein occurred within the boundaries of this Honorable Court's territorial jurisdiction.

11. Thus, legal jurisdiction and venue are proper.

## GENERAL ALLEGATIONS

12. Mr. Dalton has worked at the Michigan Education Association ("MEA") for over seven years, serving with unparalleled dedication in his current role as the Executive Director of MEA 7B Coordinating Counsel.

13. During his tenure at the MEA, Mr. Dalton has performed countless contract negotiations and maintains an impeccable arbitration record, having never lost an arbitration. He is a chief bargainer and leader in collective bargaining agreement compliance, grievance resolution, and mediation. Mr. Dalton also trains MEA employees on diversity initiatives and certification training, among an extensive list of professional accomplishments.

14. Mr. Dalton's commitment to and involvement within the MEA has allowed him to forge connections with individuals across the organization, both at the State and National level, highlighting his exceptional interpersonal skills and commitment to inclusivity.

15. Mr. Dalton's reputation within the MEA is a testament to his proficiency, leadership, and the respect he has earned across all levels of the Association.

16. Prior to his role at the MEA, Mr. Dalton dedicated ten years to the United States Army Reserve, where he held the positions of Human Resources Officer, Fraser Michigan

3

Battalion Adjutant General, Military Police Battalion, Rear Detachment Commander, and Company Command at various intervals during his service.

17. While in the United States Army Reserve, Mr. Dalton worked simultaneously as the President for the Bloomfield Hills Education Association from 2008 to 2016.

18. Mr. Dalton further maintained an extensive career in K-12 education.  In addition to being a classroom teacher for over a decade, Mr. Dalton served in various support and administrative roles, where he secured funding, implemented technology in curriculum, and developed parent workshops, while also undertaking administrative internships and technology training roles.

19. Mr. Dalton additionally coordinated testing, facilitated teacher training, managed educational programs at a residential facility, and received an Innovative Teaching Grant, showcasing his commitment to educational development and innovation across several institutions.

20. The breadth of the Mr. Dalton's experiences extends beyond his professional roles; his personal journey as an openly gay individual fueled his ability to create an inclusive workplace.

21. This aspect of Mr. Dalton's identity is a driving force behind his commitment to fostering diversity and advancing dialogue on LGBTQ+ and broad social justice issues.

22. In his role at the MEA, Mr. Dalton has performed numerous trainings and presentations on a National and State level regarding LGBTQ+ issues, social justice, and other matters related to diversity, equity, and inclusion (DEI).

23. Mr. Dalton performed DEI training at a national level for the MEA/NEA, and currently sits on the UniServ national training team.

24. In late August of 2022, the MEA posted a position for a Diversity, Equity, and Inclusion Director.

25. The MEA encouraged those from historically marginalized social identity groups to submit applications.  **Exhibit 2** – *DEI Director Job Posing*.

26. Mr. Dalton's colleagues encouraged him to apply.  Mr. Dalton's lived experiences and professional credentials made him an undeniable frontrunner for the DEI Director position.

27. By way of illustration, the minimum qualifications for the position were as follows:

> Experience in human resources and/or leading diversity efforts in an employment setting;
>
> Excellent written and verbal communication skills, including public speaking and report writing;
>
> Ability to research and apply applicable laws, rules and regulations, in partnership with the Human Resources Director and legal counsel;
>
> Ability to analyze policies/guidelines/union contracts and develop DEI strategies using a thoughtful and inclusive approach;
>
> A consensus-builder and collaborator; ability to interact with empathy;
>
> Deep passion for and commitment to honest and courageous conversations and reflection about racial justice, social class, DEI topics and issues faced by other historically marginalized groups;
>
> Ability to facilitate conversation;
>
> Ability to meet people where they are and support personal growth;
>
> Ability to interact and form strong relationships with all levels of the organizations, including union leadership and governance;
>
> Ability to coordinate the delivery and development of DEI training for staff, governance, and leaders, and assist in leadership development in the context of DEI and unconscious bias;
>
> Ability to develop metrics for measuring the effectiveness of MEA/MESSA/MEAFS diversity initiatives/policies including benchmarks and promoting accountability for diversity measures;

5

> Ability to read, analyze, and interpret general business periodicals, professional journals, technical procedures, or governmental regulations;
>
> Ability to write reports, business correspondence, and procedure manuals;
>
> Ability to effectively present information and respond to questions from groups of managers, union leaders, staff members, governance leaders/ members.

28. The position was almost tailor-made for Mr. Dalton, as he had experience in every criterion for the position, including having conducted previous diversity trainings for the MEA and their parent organization, the NEA.

29. Mr. Dalton applied and was selected for a screener interview shortly thereafter.

30. The members of the hiring committee were Defendants Wiman, Hagens, Warren, and Helmer.

31. Defendants showed their inherent bias and discriminatory intent through the statements and questions of the hiring committee.

32. During Mr. Dalton's screener interview in November 2022, Defendant Warren openly belittled Mr. Dalton's LGBTQ+ identity by stating "you *claim* to be part of a marginalized community as a gay man . . . ." (emphasis in the verbal exchange).

33. During Mr. Dalton's subsequent December 1, 2022, interview, Mr. Dalton was inappropriately questioned about his race and gender. Specifically, Defendant Warren stated, "I was shocked you applied for the job because you're a white man. How can we hire a bald white man without getting laughed at?"

34. The interview committee had no other prepared written questions for Mr. Dalton during his interview.

35. The question set an uncomfortable and targeting tone for the rest of Mr. Dalton's interview.

36. Mr. Dalton was consequently not selected for the DEI Director position.

37. On or around December 8, 2022, Mr. Dalton was informed that the position was offered instead to another applicant (hereinafter, "Chosen Applicant"). It was alleged that Chosen Applicant maintained more higher education experience than Mr. Dalton, prompting her selection by the Hiring Committee.[1]

38. In addition to the hiring committee's obvious bias, MEA Leadership prevented his selection, as Leadership wanted a more "diverse" candidate; code for a non-white candidate.

39. When Defendant Wiman verbally informed Mr. Dalton he had not been chosen for the position, Defendant Wiman implied that if they hired Mr. Dalton, they would have to hire others like Mr. Dalton.

40. Chosen Applicant maintained a less prestigious and relevant background than Mr. Dalton. Although she maintained a background in education and leadership, unlike Mr. Dalton, she had never conducted MEA level diversity training.

41. Moreover, Chosen Applicant lacked many of the minimum qualifications identified in the Application Posting, while Mr. Dalton met (and exceeded), almost all desired credentials.

42. Chosen Applicant's offer was rescinded approximately seven (7) days after her selection was announced to MEA Staff.

43. The MEA found that Chosen Applicant lacked "buy-in" from MEA staff, many of whom were outraged by her decision to opt-out of paying professional dues and her decision to send her child to a private, out-of-state boarding school—practices that are highly

---

[1] No portion of the DEI Director Application indicated a need or desire for higher education experience. The MEA is primarily a K-12 organization.

controversial within the MEA and perceived as antithetical to the mission, purpose, and culture of the organization.

44. MEA staff members voiced concerns related to Chosen Applicant's hiring during a large Zoom meeting the Monday following her hiring.

45. It is the common practice of the MEA to record Zoom meetings for later distribution. Based on information and belief, the MEA failed to save the video file, deviating from the MEA's common practice.

46. Ultimately, the MEA eliminated the DEI Director position, rather than award the position to Mr. Dalton as the alleged next "runner up."

47. On or around December 14, 2022, Mr. Dalton made an internal Complaint to Human Resources.

48. An investigation allegedly took place, but Mr. Dalton was never informed of the results.

49. On or about January 9, 2023, Tracy Stablein, the former HR Director, filed a "Formal Complaint" stating:

> It was reported by Grat Dalton that during the interview for DEI Director, he was asked by a hiring committee member, Byrant Warren, "I was shocked you applied for the job because you're a white man, how can we hire a bald man without getting laughed at?" There became more of a concern to Mr. Dalton later when he was not selected as the DEI Director, and when Jennifer Miller told him and a group of people that the hiring committee wanted to hire him, but that leadership would not allow it as they wanted a more diverse candidate.[2]

---

[2] What was actually stated in the interview was "how can we hire a bald *white* man without getting laughed at?" Mr. Dalton notes Ms. Stablein wrote the blurb in the Formal Complaint discussed above.

8

50. Mr. Dalton was ultimately discriminated against by being denied an employment position due to his race, sex, and gender.

51. The MEA's decision not to hire Mr. Dalton had no bearing on his leadership abilities or qualifications to conduct DEI work.  Instead, the decision reflected the MEA's discriminatory and retaliatory hiring process and was a pretext for racism, sexism, and gender-based discrimination.

52. Following his complaint of discrimination, Mr. Dalton experienced a palpable shift in demeanor from his colleagues at the MEA.

53. Specifically, Plaintiff received the "cold shoulder" from his peers, became alienated from colleagues, and was categorically excluded from DEI matters—a domain where he previously led, educated, and trained his contemporaries.

54. Additionally, Plaintiff was inexplicably excluded from consideration for a position on the MEA's DEI committee.

55. Defendant MEA's actions have undoubtedly damaged Mr. Dalton's reputation within the MEA.

56. The MEA's questioning of Mr. Daltons' race, sex, and gender during his interview was beyond the pale.

57. Notably, Ms. Hagen was investigated for making racially insensitive comments regarding white male staff member(s) before, during, and after Mr. Dalton's interview for the DEI Director position.

58. The MEA's alleged rationale for not re-filling the position, rather than offering it to Mr. Dalton, was that DEI decisions were best left to the MEA's own staff (despite the MEA

having originally selected Chosen Applicant, an individual with an inherent "buy-in" issue).

59. The MEA's "buy-in" excuse was a pretext.

60. The MEA's "buy-in" excuse was intended to obscure the true, unlawful motive behind Defendants decision to select Chosen Applicant over Mr. Dalton.

61. Not only is the MEA's claim unsupported by the facts, but it also fails to account for the fact that Mr. Dalton, a dedicated MEA employee, inherently possessed the "buy-in" Defendants claimed to desire, unlike Chosen Applicant, who was an outside applicant with fundamental buy-in issues.

62. Defendants' true basis for denying Mr. Dalton the DEI Director position was the improper consideration of his race, sex, and gender, despite being the most qualified candidate.

63. After rescinding Chosen Applicant's offer, Defendants have not sought to re-fill the DEI Director position.

## COUNT I

*Violation of the Elliott-Larsen Civil Rights Act (ELCRA)*

64. Plaintiff incorporates the previous paragraphs as if contained herein.

65. This Count is asserted against all Defendants and arises under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, which prohibits employment discrimination based on religion, race, color, national origin, age, sex, height, weight, familial status, or marital status.

66. It is unlawful for an employer or its agent(s) to retaliate or discriminate against a person because he opposed a violation of the Act, or because the person made a charge, filed a

complaint, testified, assisted, or participated in an investigation under the Act. MCL 37.1207.

67. To make a prima facie showing of discrimination, the individual claiming disparate treatment must show that he was a member of the class entitled to protection under the Act and that, for the same or similar conduct, he was treated differently than one who was a member of a different race, gender, or sex. *Civil Rights Comm'n v. Chrysler Corp.*, 80 Mich. App. 368, 373 (1977).

68. At all relevant times, Defendants were employers, agents of their employer, or acting in a capacity affecting employment decisions within the meaning of ELCRA.

69. Plaintiff Grat Dalton is a member of a protected class under ELCRA as a member of the LGBTQ+ community, a member of a protected racial category, and a protected gender.

70. Plaintiff was qualified for the position of Diversity, Equity, and Inclusion Director, having been the only candidate who met and exceeded the minimum qualifications required for the position as advertised by the Michigan Education Association (MEA).

71. Despite his qualifications, Plaintiff Grat Dalton was denied the position due to his race, sexual orientation, and gender identity.

72. Specifically, but not exhaustively, Defendant Warren, during Plaintiff's interview, made derogatory remarks about Plaintiff's race, sexual orientation, and gender identity, challenging Mr. Dalton's ability to serve as the DEI Director position based on being a "bald white man" and expressing shock at Mr. Dalton's application due to his race.

73. Defendants Wiman, Hagens, Warren, and Helmer, as members of the hiring committee and in their official capacities affecting MEA employment decisions, were complicit in and endorsed the discriminatory employment practice.

74. Defendants retaliated against Plaintiff following his complaint of discrimination by alienating Mr. Dalton from colleagues and excluding Mr. Dalton from DEI matters, including denying him a position on the MEA's DEI committee.

75. As a direct and proximate result of Defendants' actions, Plaintiff Grat Dalton suffered damages, including but not limited to, a lost promotion, emotional distress, reputational harm, and lost wages and benefits.

76. Defendants' conduct constituted a violation of ELCRA, as it involved discrimination in the failure to hire Plaintiff based on his membership in one or more protected classes.

WHEREFORE, Plaintiff Grat Dalton respectfully requests that this Honorable Court grant relief against Defendants for violating the ELCRA, including but not limited to, compensatory damages well in excess of $75,000, punitive damages, injunctive relief, attorney fees, costs, and any other relief this Court deems just and proper.

## COUNT II

*Violation of Title VII of the Civil Rights Act*

77. Plaintiff incorporates the previous paragraphs as if contained herein.

78. Plaintiff asserts Count II against all Defendants.

79. Title VII of the Civil Rights Act of 1964, as amended, prohibits employment discrimination based on race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(c).

80. Disparate treatment under Title VII occurs where an employer has "treated [a] particular person less favorably than others because of" a protected trait. *Ricci v. DeStefano*, 557 U.S. 557, 577, 129 S. Ct. 2658, 2672 (2009).

81. Plaintiff was subjected to discriminatory treatment during the hiring process, as evidenced by direct remarks concerning his race, sexual orientation, and gender identity that the hiring

committee did not made regarding other candidates not belonging to Plaintiff's protected classes.

82. Specifically, Defendant Warren's statements during Plaintiff's interview were intended to exclude Plaintiff from consideration based on his race, sexual orientation, and gender identity.

83. The conduct of Defendants Warren, Wiman, Hagens, and Helmer further contributed to a discriminatory hiring process through direct participation in discriminatory practices and failure to act against such practices.

84. As a result of Defendants' disparate treatment, Plaintiff Grat Dalton was denied employment for which he was exceptionally qualified, leading to damages including emotional distress, damage to reputation, and other economic losses.

85. The MEA engaged in unlawful employment practices by discriminating against Plaintiff in the hiring process for the Diversity, Equity, and Inclusion Director position based on his race, sexual orientation, and gender identity, and retaliating against him for opposing practices made unlawful by Title VII.

86. The MEA's decision not to hire Plaintiff due to his race and sex, and the subsequent retaliation for complaining about the discriminatory treatment, further violates Title VII's prohibitions against employment discrimination.

87. Defendants retaliated against Plaintiff following his complaint of discrimination alienated Mr. Dalton from colleagues and excluding from DEI matters, including being denied for a position on the MEA's DEI committee.

88. As a direct and proximate result of the Defendants' violation of Title VII, Plaintiff Grat Dalton suffered damages, including but not limited to, loss of promotion, emotional distress, reputational harm, lost wages, and benefits.

WHEREFORE, Plaintiff Grat Dalton respectfully requests that this Honorable Court grant relief against Defendant Michigan Education Association for violating Title VII of the Civil Rights Act, including but not limited to, compensatory damages, back pay, reinstatement or front pay, punitive damages, injunctive relief, attorney fees, costs, and any other relief this Court deems just and proper.

### COUNT III

*Intentional Infliction of Emotional Distress*

89. Plaintiff incorporates the previous paragraphs as if contained herein.

90. This Count is asserted against all Defendants for Intentional Infliction of Emotional Distress (IIED).

91. Defendants' conduct was extreme and outrageous, exceeding all bounds of decency that are tolerated by society.

92. Specifically, the derogatory remarks and discriminatory questioning regarding Plaintiff's race, sex, and sexual orientation during the hiring process were intentional or reckless and caused Plaintiff severe emotional distress.

93. Defendant Warren's conduct during Plaintiff's interview, including but not limited to, belittlement of Plaintiff's LGBTQ+ identity and attempting to shame Plaintiff by calling him a "bald white man," constitutes extreme and outrageous behavior targeted at Plaintiff.

94. The collective actions (and inactions), of Defendants Wiman, Hagens, Warren and Helmer in endorsing and failing to prevent discriminatory and harassing conduct contributed to Plaintiff's severe emotional distress.

95. As a direct and proximate result of Defendants' intentional or reckless conduct, Plaintiff Grat Dalton suffered severe emotional distress manifesting in both physical and psychological symptoms, including but not limited to anxiety, depression, loss of sleep, and humiliation.

WHEREFORE, Plaintiff Grat Dalton respectfully requests that this Honorable Court grant relief against Defendants for Intentional Infliction of Emotional Distress, including but not limited to, compensatory damages for emotional and psychological harm, punitive damages, attorney fees, costs, and any other relief this Court deems just and proper.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Grat Dalton respectfully requests that this Honorable Court grant the following relief:

1. Find Defendants violated the Elliott-Larsen Civil Rights Act (ELCRA).
2. Find Defendants violated Title VII of the Civil Rights Act.
3. Find Defendants intentionally inflicted emotional distress upon Plaintiff.
4. Award compensatory damages to Plaintiff for emotional distress, reputational harm, lost wages, and benefits incurred as a result of Defendants' actions.
5. Award punitive damages against Defendants to deter such discriminatory and retaliatory conduct in the future.
6. Award Plaintiff back pay, including but not limited to, salaries, bonuses, and benefits that Plaintiff would have received had he not been discriminatorily denied employment.

7. Award Plaintiff his reasonable attorney fees, costs, and expenses associated with bringing this action.

8. Order Defendants to reinstate Plaintiff to the position of Diversity, Equity, and Inclusion Director or, alternatively, provide front pay in lieu of reinstatement.

9. Grant such other and further relief as this Court deems just and proper in the circumstances.

Dated: November 11, 2024                                         Respectfully submitted,

*/s/ Eric Delaporte*
Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
Eric@DelaporteLynch.com
Gina@DelaporteLynch.com

UNITED STATES DISTRICT COURT

IN THE WESTERN DISTRICT OF MICHIGAN

GRAT DALTON,

     Plaintiff,

Case No. 1:24-cv-01188

Hon.

v.

MICHIGAN EDUCATION ASSOCIATION;
EARL WIMAN, in his individual and official capacity;
KIA HAGENS, in her individual and official capacity;
BRYANT WARREN, in his individual and official capacity;
ELENA HELMER, in her individual and official capacity;
TRACY STABLEIN, in her individual and official capacity,

     Defendants.

___

Eric D. Delaporte (P69673)
Gina E. Goldfaden (P86863)
DELAPORTE LYNCH, PLLC
Attorney for Plaintiff
210 State St., Suite B
Mason, MI 48854
(517) 999-2626
Eric@DelaporteLynch.com
Gina@DelaporteLynch.com

___

## JURY DEMAND

In accordance with Federal Rules of Civil Procedure Rule 38(b)(l) and (2), Plaintiff Grat Dalton hereby demands that the above-captioned case be tried by Jury.

Dated: November 11, 2024                                  Respectfully submitted,

                                                          /s/ Eric D. Delaporte
                                                          Eric D. Delaporte (P69673)
                                                          Gina E. Goldfaden (P86863)
                                                          210 State St., Suite B
                                                          Mason, MI 48854
                                                          (517) 999-2626
                                                          Eric@DelaporteLynch.com
                                                          Gina@DelaporteLynch.com